10/14/14  P. v. Martinez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ISAAC MARTINEZ et al.,<br><br>    Defendants and Appellants. | B246130<br><br>(Los Angeles County<br>Super. Ct. No. MA057543)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING,<br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on September 29, 2014, be modified as follows:

1.  On page 2, third sentence of the Introduction, insert the words "and constitutional" after the word "evidentiary" so that the sentence reads as follows:

> Gonzales contends that the judgment should be reversed because of evidentiary and constitutional error, instructional error, and prosecutorial misconduct.

2.  On page 12, after the partial paragraph ending with the citation, "(*People v. Geier* (2007) 41 Cal.4th 555, 584.)," add the following paragraph:

> Moreover, contrary to Gonzales' assertion, the trial court's exclusion of Haro's statements to the prosecutor did not violate Gonzales' federal constitutional rights to a fair trial and to present a defense.  As the Supreme

Court has recently observed "'"[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense."' [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 270.)

There is no change in the judgment. Appellant Gonzales' petition for rehearing is denied.

_____        _____        _____
PERLUSS, P. J.        ZELON, J.        SEGAL, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B246130 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA057543) |
| v. | |
| ISAAC MARTINEZ et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Lisa Mangay Chung, Judge. Affirmed as modified as to Martinez; affirmed as to Gonzales.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant Isaac Martinez.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Gonzales.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

A jury convicted Daniel Gonzales, a prison inmate, of attempted willful, deliberate, and premeditated murder and aggravated assault by a state prisoner. The jury also convicted Isaac Martinez, a prison inmate serving a life sentence, of attempted willful, deliberate, and premeditated murder and aggravated assault by a life prisoner. Gonzales contends that the judgment should be reversed because of evidentiary error, instructional error, and prosecutorial misconduct. Martinez contends that the trial court sentenced him incorrectly. Because we conclude that only Martinez's contention has merit, we modify his sentence, and otherwise affirm the judgments.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Attack*

On June 28, 2012 Angelo Flores, a correctional officer at Lancaster State Prison, was stationed in an observation tower overlooking the "B yard" when he saw Martinez and Gonzales fighting with fellow inmate Johnny Haro. A small group of the 15 to 20 inmates in the yard was watching the fight from about 20 feet away. None of the observers assisted or came to the aid of the combatants.

Gonzales was the tallest and largest of the three men, and Haro was the smallest. Gonzales, who appeared to be the main aggressor, held Haro up against a chain link fence by the throat, while he and Martinez repeatedly punched Haro.

Officer Flores activated an alarm, and all of the inmates in the yard except Martinez, Gonzales, and Haro dropped to the ground in a prone position. A number of correctional officers responded and repeatedly ordered the three inmates to stop fighting or "get down." They did not comply. Gonzales continued to pin Haro against the fence with his left arm and punch him with his right hand. Martinez also continued to hit Haro but would step back, start lowering himself as if he were going to get on the ground, and then stand up and punch Haro some more.

2

Officer Flores estimated that Martinez hit Haro 40 times, while Gonzales hit Haro 50 times. The two men were "swinging very rapidly," and Haro was "punching back." Officer Flores estimated that Haro threw 30 punches at Gonzales and Martinez. Other correctional officers did not see Haro throw any punches; they believed Haro was simply trying to block punches from Martinez and Gonzales.

Several officers used pepper spray, and one officer used a baton in unsuccessful efforts to halt the fighting. As the fighting continued, Officer Juliana Villalobos Wiard saw one of the attackers stab Haro numerous times in the side with a metal weapon. When Officer Wiard yelled "weapon," the officers stepped back, creating some distance between them and the three inmates. The officers then deployed a second round of pepper spray. An officer then struck Gonzales twice with a baton, after which Gonzales and Martinez got down on the ground.

Martinez and Gonzales were handcuffed, searched, and escorted away. The officers did not find any weapons on them. One officer, however, found a makeshift weapon on the other side of the fence where the fight had occurred: a nail with a cellophane plastic handle that had been sharpened to a point. Another officer collected clothing and a pair of broken glasses with blood and dirt on it from the yard.

Martinez's right hand was red and swollen, and he complained of pain. He had abrasions on his right forearm and elbow and bruising in the knuckle area of his right hand. A "chunk of skin" was missing from the knuckle area of his left hand, and there was bruising and dried blood as well. There was visible redness and irritation from the pepper spray on different parts of his body. Martinez had no puncture wounds. The white shorts and tennis shoes that Martinez had been wearing during the fight, and which the officers collected as evidence, had blood on them.

Gonzales had scratches and abrasions on his fists and forearms, as well as dried blood. His right hand and the left side of his chest and buttocks were red, and there was fresh bruising on Gonzales' lower back. Gonzales' clothes, which the officers also collected as evidence, were covered in blood.

While the injuries to Martinez and Gonzales were minor, Haro's injuries were so extensive and severe that the nurse who tended to him called 911. The paramedics transported Haro to Antelope Valley Hospital, where Dr. Brian Lugo treated him. Haro arrived in critical condition. He had seven puncture wounds to his chest, abdomen, and back. He had blunt trauma to his head, chest, and torso. He had suffered a pneumothorax (collapsed lung) and a hemothorax that caused two to three cups of blood to leak into his chest. Either of these conditions alone, or in combination, could have been fatal. X-rays revealed that Haro also suffered three fractured ribs on his left side, and a CAT scan revealed puncture wounds to Haro's lungs. Dr. Lugo testified at trial that the fractures could have been caused by repeated punching for a minute and a half to two minutes, and the puncture wounds to his lungs could have been caused by a sharp object.

B.     *The Information*

In an amended information, the People charged Gonzales and Martinez with attempted willful, deliberate, and premeditated murder of Haro (Pen. Code,[1] §§ 187, subd. (a), 664; count 1) and assault with a deadly weapon (§ 245, subd. (a)(1); count 3). The People also charged Martinez with aggravated assault by a life prisoner (§ 4500; count 4) and Gonzales with aggravated assault by a state prisoner (§ 4501; count 2).[2] As to all counts the People alleged that during the commission of the crime Martinez and Gonzales had personally inflicted great bodily injury on Haro (§ 12022.7, subd. (a)).

In addition, the People alleged that on September 6, 2007, in Los Angeles Superior Court case No. BA306533 Martinez was convicted of five felonies that qualified as prior serious or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12), and as prior serious felony convictions within the meaning of

---

[1]     All undesignated statutory references are to the Penal Code.

[2]     The People originally charged Martinez, along with Gonzales, in count 2. During trial, the court granted the People's motion to strike Martinez's name from count 2.

section 667, subdivision (a)(1).  The People also alleged that Gonzales had suffered one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) and one prior serious felony conviction (§ 667, subd. (a)(1)).

C.    *The Verdict*

The jury found Martinez guilty on counts 1 and 4, and Gonzales guilty on counts 1 and 2.  The jury also found true the great bodily injury allegations contained in these counts.[3]  Pursuant to section 1385, the trial court dismissed count 3 in the interests of justice.[4]  Gonzales and Martinez waived their rights to a trial on the prior conviction allegations and admitted the allegations.

D.    *The Sentence*

The trial court sentenced Gonzales on count 1 to state prison for an indeterminate term of life with a minimum parole eligibility period of 14 years (seven years doubled under the three strikes law) plus a consecutive determinate term of eight years, comprised of three years for the great bodily injury enhancement plus five years for his prior serious felony conviction, for an effective sentence of 22 years to life.  On count 2 the court imposed an aggregate term of 20 years and stayed it pursuant to section 654.

---

[3]    The verdict forms for counts 2 and 4 asked the jury to determine whether Martinez and Gonzales personally used a deadly and dangerous weapon, a shank, during the commission of the crimes within the meaning of section 12022, subdivision (b)(1).  The jury returned true findings.  Because the People did not allege a section 12022, subdivision (b)(1), enhancement in counts 2 and 4 of the amended information, the trial court at sentencing struck the jury's true findings.

[4]    Assault with a deadly weapon, the crime alleged in count 3, is a lesser included offense of aggravated assault by a life prisoner (*People v. Milward* (2011) 52 Cal.4th 580, 583, 589) and aggravated assault by a state prisoner (*People v. Cabral* (1975) 51 Cal.App.3d 707, 715-716).  Because the jury found each defendant guilty of his respective greater offense, the trial court dismissed count 3.  (See *Milward*, *supra*, at p. 585 ["a defendant may not be convicted of both the greater and the lesser offense"]).

The trial court sentenced Martinez on count 4 to an aggregate term of life without the possibility of parole, plus a determinate term of 28 years, consisting of three years for the great bodily injury allegation and five separate, five-year prior serious felony enhancements pursuant to section 667, subdivision (a). On count 1 the court sentenced Martinez to an aggregate term of 35 years to life plus 28 years and stayed the term pursuant to section 654 upon the completion of the sentence imposed on count 4. Martinez filed his notice of appeal following sentencing.

One week later, the trial court, realizing that it had made a mistake when sentencing Martinez on count 4, resentenced him on that count only.[5] The court noted that, because Haro did not die as a result of the assault, "the mandated sentence is not [life without the possibility of parole], but is life without the possibility of parole for nine years."[6] Pursuant to section 667, subdivision (e)(2)(A)(iii), the court calculated

---

[5] Although a trial court generally lacks jurisdiction to resentence a defendant after execution of sentence commences, there are exceptions. (*People v. Turrin* (2009) 176 Cal.App.4th 1200, 1204) One of the exceptions is set forth in section 1170, subdivision (d), which states that "a trial court may recall the sentence on its own motion within 120 days after committing a defendant to prison." (*Id.* at p. 1204; see *People v. Nelms* (2008) 165 Cal.App.4th 1465, 1472 ["under section 1170, subdivision (d), the trial court retains jurisdiction to recall a sentence in a criminal matter and to resentence the defendant notwithstanding the pendency of an appeal"].) In addition, an unauthorized sentence may be corrected at any time. (*Turrin*, *supra*, at p. 1205.) "A sentence is unauthorized 'where it could not lawfully be imposed under any circumstance in the particular case [such as] . . . where the court violates mandatory provisions governing the length of confinement.'" (*People v. Gisbert* (2012) 205 Cal.App.4th 277, 280, quoting *People v. Scott* (1994) 9 Cal.4th 331, 354.) Thus, "[a]lthough, as a general rule, 'an appeal from an order in a criminal case removes the subject matter of that order from the jurisdiction of the trial court' [citation], it is settled that an unauthorized sentence is subject to correction despite the circumstance that an appeal is pending." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1044; see *People v. Williams* (2007) 156 Cal.App.4th 898, 906.)

[6] Section 4500 provides in part: "Every person while undergoing a life sentence, who is sentenced to state prison within this state, and who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death or life

6

Martinez's minimum term under the three strikes law as 37 years. The court then resentenced Martinez to life in prison without the possibility of parole for 37 years, plus a consecutive term of 28 years for the enhancements, for a total effective sentence of 65 years to life. Martinez appealed again after resentencing. Gonzales also appealed.

## DISCUSSION

A. *Gonzales' Appeal*

    1. Declaration Against Interest

       a. Relevant Facts

During a hearing outside the presence of the jury, the trial court advised Haro that he might be called as a witness. Haro acknowledged that he had spoken with counsel, and he asserted rights under the Fifth Amendment. The court stated that based on the evidence that it had heard so far, the court did not see any Fifth Amendment issues. The court told Haro that if he were called as a witness the court would require him to testify and that his failure to do so would subject him to possible contempt proceedings.

After the prosecution rested, counsel for Martinez called Haro as a defense witness. When the court clerk attempted to administer the oath, Haro refused to look at or answer the clerk. The court told Haro that he had to take the oath and answer questions and that if he failed to do so the court might find him in contempt of court. Despite this advisement, Haro refused to speak. The court stated that Haro could be in contempt of court and that the court would schedule a hearing.

After Haro left the courtroom and returned to lockup, counsel for Martinez stated that he intended to call the prosecutor as a witness because Haro was now unavailable

imprisonment without possibility of parole. The penalty shall be determined pursuant to the provisions of Sections 190.3 and 190.4; however, in cases in which the person subjected to such assault does not die within a year and a day after such assault as a proximate result thereof, the punishment shall be imprisonment in the state prison for life without the possibility of parole for nine years."

and had made a statement to the prosecutor about "mutual combat" during a previous interview. Counsel for Martinez, joined by counsel for Gonzales, argued that Haro's statement was admissible as a declaration against Haro's personal and criminal interests.

The prosecutor explained that she had previously spoken with Haro at the courthouse lockup to determine whether he would testify. The prosecutor decided to meet with Haro alone in an effort to befriend him and convince him of the importance of testifying. Haro told the prosecutor that he was not going to talk to anyone and intended to invoke his constitutional rights. He also said that an investigator and another individual had approached him a few days earlier, and he told them, "I am not going to talk to anyone, neither the defense nor the prosecutor." Haro repeatedly told the prosecutor, "I am going to be bad for either side, defense or prosecutor. So you don't want me to get on the stand." The prosecutor added that Haro was "extremely upset" because of a change in housing status that affected his visitation. She stated that Haro "made it very clear to me that he was not going to talk." When the prosecutor tried to change the subject and asked Haro if he knew why he was there, Haro said "a situation with mutual combat," but he did not describe the incident. Haro also denied knowing the people involved.

Haro did share with the prosecutor that he had only been in the Lancaster prison for three months prior to the incident. In response to the prosecutor's comment that something had happened to him because he had several injuries and had been taken to the hospital, Haro responded, "Nothing happened to me." When the prosecutor asked Haro about his puncture wounds, he said, "There are no puncture wounds. I don't know what you are talking about. Show me the photos." The prosecutor asked Haro if he was suggesting that the medical personnel at the hospital had lied in his medical records. Haro said, "I am not saying anything." Haro then stated that the correctional officers had lied and that "[t]hey knew about this hit against me days before it happened and they didn't do shit about it.'" Haro stated that the person who told him about the hit had been placed in protective custody. Haro repeatedly stated that he did not trust them, he would not testify, and the prosecutor could not make him testify. Haro made a personal plea to

8

the prosecutor stating, "You can read between the lines. You are a smart lady." He emphasized that he had many more years to spend in prison. He denied being a "gang banger" but stated he acted like one to try to fit in. He said he was not what he seemed, but he had to survive in prison.

The prosecutor again asked Haro about his medical records and whether Haro believed the members of the medical staff in the hospital were lying. Haro said he suffered two broken ribs and a collapsed lung during an incident that happened in January at another facility, but he would not give any details. He begged the prosecutor to send him back to a different prison. Haro repeatedly pleaded with the prosecutor to "be compassionate with me." "Be compassionate with me. You know how to read between the lines." The prosecutor tried to explain to Haro that even if she did not call him in her case-in-chief, the defense could call him and therefore he had to stay in lockup until the end of trial. Haro again stated he would not say anything.

Haro also asked the prosecutor whether she had to read him his *Miranda*[7] rights. The prosecutor explained that, based on all the information she had, he was a victim, not a suspect, and therefore *Miranda* warnings were not necessary. When the prosecutor asked if she should consider him a suspect, Haro did not respond.

The prosecutor then advised the court and defense counsel that Haro also said, "Look, you know, whatever happens in this case, please be compassionate towards me." She emphasized that "[t]he look that he had on his face," which she had not noted in her three-page outline of her interview with Haro, "clearly indicated there was a large amount of fear in him should I — should I call him to the stand." Haro also kept saying, "You can do this without me. Those puncture wounds are not from that day."

After listening to the prosecutor's explanation, the trial court ruled: "Counsel, based on what I've heard, I believe there has been an initial satisfactory showing of unavailability. So if we turn now to the declaration against interest and the cases and

---

**7**      *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

9

principles outlined there, there has to be sufficient particularized guarantees of trustworthiness because such a statement in issue is not subject to the traditional safeguards for liability such as cross-examination by all of the sides. That particular determination by the court is very fact dependent. And in reviewing the cases that I've reviewed, you look to the totality of the circumstances and the context of the cases, who the statement was made to, what motivations there might have been, to what degree the defendants are being implicated. My concern with the statement in its entirety, taken in isolation a situation with mutual combat, there is no additional information from Mr. Haro as relayed by [the prosecutor] about even identifying the people involved. I suppose one can make an argument he is referencing the incident so you can infer it is the two defendants. But he gives conflicting statements that cause this court concern in terms of its veracity and overall reliability. He takes issue with the correctional officers that they knew about this hit days before, which is contrary to a situation of mutual combat. There are concerns or problems with his motivations here in terms of wanting to go back to the general population. He gives conflicting statements, although he is definitely not conflicting in terms of his desire not to testify. But in terms of all of the individual statements and in its totality, it does not point unerringly against his interest in terms of insufficient facts in terms of fleshing out the roles of the two defendants. And the court finds that under the principles set forth and just analogizing it to other cases that are — that discussed facts that it is not sufficiently similar, and the court's ruling is not to admit it."

b.     Analysis

Evidence Code section 1230 provides that "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1108; *People v. Duarte* (2000) 24 Cal.4th

603, 610.)  ""The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration.  [Citations.]  In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant."  [Citation.]'  [Citation.]"  (*People v. Gonzales* (2011) 51 Cal.4th 894, 933, fn. omitted.)

"'A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'  [Citation.]"  (*People v. Brown* (2003) 31 Cal.4th 518, 534; accord, *People v. McCurdy*, *supra*, 59 Cal.4th at p. 1108.)  The trial court's determination whether "the evidence bore sufficient indicia of trustworthiness [is] a decision we review on appeal for abuse of discretion."  (*Brown*, *supra*, p. 536; see *People v. Cudjo* (1993) 6 Cal.4th 585, 607 [the trial court's determination "whether the declaration passes the required threshold of trustworthiness . . . is reviewed for abuse of discretion"]; but see *People v. Tran* (2013) 215 Cal.App.4th 1207, 1218 ["we independently review the trial court's preliminary determination that a declarant's statements bore sufficiently particularized guarantees of trustworthiness to be admissible"]; *People v. Cervantes* (2004) 118 Cal.App.4th 162, 174 ["there is some disagreement as to whether the trial court's ruling on this issue [indicia of trustworthiness] should be reviewed for an abuse of discretion or de novo"].)[8]

The trial court's finding of untrustworthiness was not an abuse of discretion.  Haro made it clear that he did not want to testify because he was afraid.  He knew he had to survive in prison for many more years and did not want any problems.  Although he did use the term "mutual combat" when speaking to the prosecutor, there is nothing in the

---

[8]     We follow the Supreme Court's statements in *Brown* and *Cudjo*.

record suggesting that Haro understood the legal meaning or significance of that term or that his statement might subject him to criminal liability.**9**  He did not identify the persons with whom he was fighting.  More significantly, his assertion that the correctional officers had lied and that "[t]hey knew about this hit against me days before it happened and they didn't do shit about it'" tells a quite different and contradictory story, and places the blame on others.  (See *People v. Duarte*, *supra*, 24 Cal.4th at p. 612 ["a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible'"]; cf. *People v. Samuels* (2005) 36 Cal.4th 96, 120 [hearsay statement properly admitted under Evidence Code section 1230 where the witness' "facially incriminating comments were in no way exculpatory, self-serving, or collateral"].)  Given the conflicting nature of Haro's statements and the fear he exhibited with his pleas for compassion, the trial court did not abuse its discretion in finding that his statement was not against his interests and "'in light of [the] circumstances, lack[ed] sufficient indicia of trustworthiness . . . .'"  (*People v. Geier* (2007) 41 Cal.4th 555, 584.)

2.      Request For Instructions on Self-Defense and Mutual Combat

Counsel for Gonzales asked the trial court to instruct the jury on self-defense and mutual combat.  The trial court refused, explaining:  "I don't find sufficient evidence to support self-defense.  It has both an objective and subjective component in terms of fear of imminent harm.  There has really been no testimony.  There has been absence of evidence.  Simply because their witness can testify as to how the fight started, there really isn't sufficient evidence to support that the victim was the aggressor in this case.  Also, in the mutual combat principle for that doctrine to be given, I don't see anything that's been elicited or any testimony that this was a prearranged agreement to fight, which is the typical case of a mutual combat.  In addition, the court has also noted that the assaultive

---

**9**      See *post* part A(2)(b).

12

conduct by both defendants continued or was described by various correctional officer witnesses even after multiple commands have been given to get down and to lay on the ground. So for those reasons and over both defense objections, the court declines to give those instructions."

Gonzales argues that the trial court committed reversible instructional error in denying his request to instruct the jury on self-defense and mutual combat. "'[T]he trial court must instruct on the general principles of law relevant to the issues raised by the evidence.'" (*People v. Smith* (2013) 57 Cal.4th 232, 239.) "That duty extends to '"instructions on the defendant's theory of the case, including instructions 'as to defenses "'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"'"' [Citation.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 996.) The court need not give an instruction requested by a defendant if it is not supported by substantial evidence. (*People v. Duff* (2014) 58 Cal.4th 527, 561-562.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982-983.)

a.     Self-Defense

"Perfect self-defense requires that a defendant have an honest and reasonable belief in the need to defend himself or herself." [10] (*People v. Rodarte*, *supra*, 223 Cal.App.4th at p. 1168; accord, *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1227.) Gonzales argues: "The testimony of Officer Flores and the physical evidence of Gonzales' broken glasses constituted substantial evidence of self defense. Officer

---

[10]     "The doctrine of self-defense embraces two types: perfect and imperfect." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.) The latter is "limited to the negation of the malice element of murder" (*ibid*.) and therefore has no applicability to this case.

13

Wiard's testimony that '*They* refused. *They* continued to fight,' indicates that this was a back and forth fight as opposed to a one-sided attack. [Citation.] When Officer Richards bagged [Gonzales'] glasses as evidence it shows that initially [Gonzales] was also considered an assault victim. As such, it would have been proper to have instructed the jury on self-defense and the trial court's denial of the defense request for self-defense instructions was error."

Officer Flores' testimony, however, does not support Gonzales' claim of self-defense. Neither a broken pair of glasses collected as potential evidence nor the fact that the three men continued to fight when the correctional officers ordered them to stop suggests that Gonzales had an honest and reasonable belief in the need to defend himself. Indeed, the evidence shows that Gonzales was the aggressor who pinned Haro against the fence and, along with Martinez, pummeled him. There is no evidence that Gonzales tried in good faith to stop fighting, communicated this desire to Haro in such a way that a reasonable person would understand that he wanted to stop fighting, in fact stopped fighting, or gave Haro a chance to stop fighting. (See *People v. Johnson* (2009) 180 Cal.App.4th 702, 704-705; *People v. Hernandez* (2003) 111 Cal.App.4th 582, 588-589.) In fact, it was not until officers sprayed a second round of pepper spray and an officer hit Gonzales with a baton that he and Martinez stopped fighting. And the fact that Gonzales and Martinez sustained minor injuries while Haro sustained extensive and life threatening injuries hardly supports a self-defense instruction. Gonzales has failed to demonstrate that the evidence warranted giving an instruction on self-defense.

b.      Mutual Combat

The term "'mutual combat' consists of fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight. The agreement need not have all the characteristics of a legally binding contract; indeed, it necessarily lacks at least one such characteristic: a lawful object. But there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight*

14

*before the claimed occasion for self-defense arose.*" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1046-1047.)

Gonzales has not cited to any evidence in the record from which a jury could reasonably infer that Haro agreed in advance to meet Martinez and Gonzales in the prison yard for the purpose of fighting, nor has he provided any explanation for why Haro, the smallest of the three men, would agree to fight two larger inmates. The mere fact that all three men threw punches during the struggle is not substantial evidence that they agreed in advance to engage in mutual combat. The trial court properly denied Gonzales' request for an instruction on mutual combat. (Cf. *People v. Jackson* (2014) 58 Cal.4th 724, 760 ["testimony gave rise to a reasonable inference that the fight between [two opposing gangs] had been prearranged, and that prisoners involved on both sides had engaged in '"mutual combat" . . . pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities'"]; *People v. Valenzuela*, *supra*, 199 Cal.App.4th at pp. 1232-1234 [evidence that two groups of opposing gang members with multiple prior altercations engaged in a shootout warranted an instruction on mutual combat].)

### 3. Prosecutorial Misconduct

Gonzales argues that the prosecutor engaged in misconduct during her closing argument to the jury when she used the terms "hoodlums"[11] and "animals."[12] Gonzales has not preserved these assertions of prosecutorial misconduct on appeal, and, in any event, they fail on the merits.

---

[11] In responding to statements counsel for Martinez made to the jury, the prosecutor stated, "And he wasn't referring to glasses or shorts or T-shirts. He was referring to the weapon. He himself stated in his own closing argument that either his client or the other hoodlum had the weapon."

[12] Later, while discussing "state prison culture where indeed people get involved in fights" on a daily basis, the prosecutor argued, "Is it not why we're here? To tell these men, part of that culture, that's unacceptable. That's just not right. Who are you? Animals? Because only animals attack each other like that."

15

"'""Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such '"'unfairness as to make the resulting conviction a denial of due process.'"'" [Citation.] 'Under California law, a prosecutor commits reversible misconduct . . . if he or she makes use of "deceptive or reprehensible methods" in attempting to persuade either the trial court or the jury, and there is a reasonable possibility that without such misconduct, an outcome more favorable to the defendant would have resulted.' [Citation.] '"To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm."' [Citation.]" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 480; see *People v. Jackson*, *supra*, 58 Cal.4th at p. 762; *People v. Williams* (2013) 58 Cal.4th 197, 274.)

After the prosecutor had completed her rebuttal argument, counsel for Martinez objected to specific comments made by the prosecutor, and counsel for Gonzales joined in the objection. Neither attorney, however, ever asked the trial court to admonish the jury, and on appeal Gonzales does not contend, let alone make an effort to demonstrate, that an admonition would have been futile. (See *People v. Duff*, *supra*, 58 Cal.4th at p. 567 ["a defendant must seek a jury admonition or show one would have been futile"].) Therefore Gonzales has failed to preserve his claim of prosecutorial misconduct. (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1238.)

In any event, there was no prosecutorial misconduct. As the trial court correctly found, the prosecutor's single reference to "hoodlum" and her brief analogy to "animals," considered in the context of the brutal beating and stabbing of Haro, were within the permissible bounds of argument. While the Supreme Court has stated that it does "not condone the use of opprobrious terms in argument," the Supreme Court has also held that "such epithets are not necessarily misconduct when they are reasonably warranted by the evidence." (*People v. McDermott* (2002) 28 Cal.4th 946, 1002; accord, *People v. Tully* (2012) 54 Cal.4th 952, 1045; see *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275, 1295 [it was not misconduct for the prosecutor during closing argument "to call defendant

16

'Ivan the Terrible' and 'the camp commandant'" of a concentration camp]; *McDermott*, *supra*, at p. 1003 [prosecutor's description of defendant "as 'a mutation of a human being,' a 'wolf in sheep's clothing,' a 'traitor,' a person who 'stalked people like animals,' and someone who had 'resigned from the human race'" were "within the permissible bounds of argument" when considered in the context of the manner in which the murder had been planned and executed].)

Finally, Gonzales takes issue with the prosecutor's statement, "Hey, did you have a bullet hole in the past or [a] gunshot wound . . . ?  Let's shoot you again.  What is another one going to do?"  The trial court properly overruled Gonzales' objection to this statement.  The prosecutor was simply responding to counsel for Martinez's argument that Haro was more susceptible to injury because he had a prior history of rib fractures.  The challenged statement was preceded by the following:  "And for some reason [counsel for Gonzales] wants you to assume that because Mr. Haro had a prior history of rib fractures in the past, nothing was caused to him this time around.  Or perhaps, as [counsel for Martinez] said, he is more susceptible.  So just because someone is more susceptible, does that mean you are going to beat the you know what out of him in that particular location to break his ribs again and for some reason again that is excused?  It is fine.  His ribs were broken in the past.  Why not again?"  When viewed in context, the challenge statement was well within the realm of proper argument.[13]

### 4.     Joinder

Gonzales "joins in any arguments raised by counsel for [Martinez] . . . that are to his benefit."  There are none.

---

[13]     Gonzales also maintains that the prosecutor referred to him and Martinez as "bad people."  Gonzales, however, does not cite the page of the reporter's transcript where the prosecutor used this characterization.

B.      *Martinez's Appeal*

Martinez argues that the trial court imposed an unauthorized sentence by imposing five separate five-year prior serious felony conviction enhancements under section 667, subdivision (a)(1), which resulted in the imposition of unauthorized sentences on both counts.  The People concede that Martinez is correct, and we agree.

1.      Prior Serious Felony Conviction Enhancement

Section 667, subdivision (a)(1), provides in pertinent part that "any person convicted of a serious felony who previously has been convicted of a serious felony in this state . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges *brought and tried separately*."  (Italics added; see *People v. Park* (2013) 56 Cal.4th 782, 795-796.)  In *In re Harris* (1989) 49 Cal.3d 131 the California Supreme Court held that "the requirement in section 667 that the predicate charges must have been 'brought and tried separately' demands that the underlying proceedings must have been formally distinct, from filing to adjudication of guilt."  (*Id*. at p. 136; see *People v. Frausto* (2009) 180 Cal.App.4th 890, 903.)  Thus, where "the record plainly reveals, the charges in question were not 'brought . . . separately,' but were made in a single complaint" (*Harris*, *supra*, at p. 136), the court can only impose a single five-year enhancement.  (*Id*. at p. 137).

The record reveals that the charges underlying Martinez's five prior serious felony convictions were brought in the same case, and that Martinez was convicted of all five offenses on September 6, 2007.  Because Martinez suffered all five convictions in a single proceeding, the predicate charges were not "brought and tried separately."  Therefore, the trial court could only impose one five-year enhancement.

2.      The Trial Court's Error in Calculating Three Strikes Sentences

"In third strike cases, the Three Strikes law uses enhancements in two distinct ways: to calculate the minimum term of the indeterminate life sentence and to add an additional, determinate term to be served before the indeterminate life sentence.  'The

18

two distinct functions of enhancements are found in the two required stages in calculation of a "third strike" sentence: the determination of "the greatest minimum term" and the final sentence calculation which is to include all applicable enhancements.' [Citation.]" (*People v. Williams* (2004) 34 Cal.4th 397, 403.)

Section 667, subdivision (e), as it existed in 2012 when Martinez committed his crimes, provided in relevant part: "For purposes of subdivisions (b) to (i), inclusive, and in addition to any other enhancement or punishment provisions which may apply, the following shall apply where a defendant has a prior felony conviction: [¶] . . . [¶] (2)(A) If a defendant has two or more prior felony convictions as defined in subdivision (d) that have been pled and proved, the term for the current felony conviction shall be an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of:

"(i) Three times the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior felony convictions.

"(ii) Imprisonment in the state prison for 25 years.

"(iii) The term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, or any period prescribed by Section 190 or 3046." (Stats. 1994, ch. 12, § 1.)

When the trial court sentenced Martinez, the court erroneously believed that it could impose five separate five-year enhancements under section 667, subdivision (a)(1). This error led the court to determine that option three produced the greatest minimum term on count 4 and count 1 and caused the court to calculate the minimum term of an indeterminate life sentence on those counts erroneously.

The punishment for aggravated assault by a life prisoner when the victim does not die within a year and a day of the assault is "imprisonment in the state prison for life without the possibility of parole for nine years." (§ 4500.) Section 3046, subdivision (a)(2), provides: "No prisoner imprisoned under a life sentence may be paroled until he or she has served the greater of the following: [¶] . . . [¶] (2) A term as established

19

pursuant to any other provision of law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole." Pursuant to sections 4500 and 3046, the minimum term on count 4 is nine years.

The greatest "minimum term" Martinez has to serve under the three strikes law is calculated pursuant to section 667, subdivision (e)(2)(A). Under option one, Martinez's minimum term is three times nine, or 27 years. (See § 667, subd. (e)(2)(A)(i).) Under option two the minimum term is 25 years. (§ 667, subd. (e)(2)(A)(ii).) Under option three, Martinez's minimum term is nine years, plus three years for the great bodily injury enhancement, plus five years for the prior serious felony enhancement, for a total of 17 years. (§ 667, subd. (e)(2)(A)(iii).) Thus, option one produces the greatest minimum term on count 4, 27 years. Therefore, Martinez's final sentence on count 4 should have been life without the possibility of parole for 27 years, plus a determinate term of eight years, comprised of three years for the great bodily injury enhancement and five years for the prior serious felony conviction enhancement. Martinez's effective sentence on count 4 is 35 years to life, rather than the sentence of life without the possibility of parole, plus a determinate term of 28 years, imposed by the trial court at the original sentencing hearing, or the total sentence of 65 years imposed by the court at resentencing.

The punishment for attempted willful, deliberate, and premeditated murder is "imprisonment in the state prison for life with the possibility of parole." (§ 664, subd. (a).) The minimum term of imprisonment for life with the possibility of parole is seven years. (§ 3046, subd. (a)(1).)

Calculating the greatest minimum term for count 1, under option one the minimum term is 21 years, consisting of three times the seven-year minimum term set forth in section 3046. (§ 667, subd. (e)(2)(A)(i).). Under option two the minimum term is 25 years. (§ 667, subd. (e)(2)(A)(ii).) Under option three the minimum term is 15 years, consisting of the seven-year minimum term, plus three years for the great bodily injury enhancement, and five years for the prior serious felony enhancement. (§ 667, subd. (e)(2)(A)(iii).) Thus, as to count 1, the greatest minimum term is option two, 25 years.

Therefore, the sentence on count 1, stayed pursuant to section 654, should have been life in prison with a minimum term of 25 years, plus a determinate term of eight years for a total effective sentence of 33 years to life, as opposed to the 63 years to life imposed by the trial court.

## DISPOSITION

The judgment as to Gonzales is affirmed. The judgment as to Martinez is modified by striking four of the five-year enhancements imposed pursuant to section 667, subdivision (a)(1), on count 4 and count 1, and corrected so that the minimum period of confinement on the indeterminate term imposed on count 4 is 35 years and the minimum period of confinement on the indeterminate term imposed on count 1 is 33 years. As modified, the judgment as to Martinez is affirmed. The superior court is directed to prepare an amended abstract of judgment as to Martinez and to forward a copy to the Department of Corrections and Rehabilitation.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21